**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEGRIA PRODUCTIONS INC.,<br><br>Plaintiff,<br><br>v.<br><br>99 SCOTT STUDIO LLC and<br>HAPPIER PEOPLE MANAGEMENT LLC<br><br>Defendant. | Civil Action No. 1:26-cv-05208<br><br>**COMPLAINT** |

Plaintiff Alegria Productions Inc. ("Alegria"), by and through its attorneys, DGW Kramer LLP, for their Complaint against Defendants 99 Scott Studio LLC ("Venue") and Happier People Management LLC ("Management"), alleges as follows:

## INTRODUCTION

1. For more than twenty-five years, Plaintiff Alegria Productions Inc., through its principal Ric Sena, has organized some of the nation's premier LGBTQ+ events, including Alegria Sunday, an annual Pride Weekend event held in New York City. Except for a brief interruption during the COVID-19 pandemic, Alegria Sunday has been held every summer for more than two decades and has become a longstanding tradition within the LGBTQ+ community.

2. That tradition was abruptly broken in the summer of 2026. Defendants 99 Scott Studio LLC ("99 Scott") through its management company Happier People Management LLC ("Happier") entered into a written agreement to provide the venue and services necessary to host Alegria Pride on Sunday June 28, 2026. Instead, Defendants failed to provide a venue suitable for the event's intended purpose, rendering performance of the Agreement impossible and forcing the cancellation of the event.

3. This action arises from Defendants' fraudulent misrepresentations, breaches of their contractual obligations, and their negligent and grossly negligent conduct all of which caused Plaintiff to suffer substantial damages.

**PARTIES, JURISDICTION, AND VENUE**

4. Plaintiff Alegria Productions, Inc. ("Plaintiff" or "Alegria") is a Florida corporation.

5. Upon information and belief, Defendant 99 Scott Studio LLC ("99 Scott") is a New York limited liability company with its principal place of business at 99 Scott Avenue, Unit G, Brooklyn, New York 11237.

6. Upon information and belief, 99 Scott Studio LLC is wholly owned by one or more natural persons domiciled in the State of New York, and none of its members is a citizen of the State of Florida.

7. Upon information and belief, Defendant Happier People Management LLC ("Happier") is a New York limited liability company with its principal place of business in Kings County, New York.

8. Upon information and belief, Happier People Management LLC is wholly owned by one or more natural persons domiciled in the State of New York, and none of its members is a citizen of the State of Florida.

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Defendants because Defendants are domestic limited liability companies and the acts and omissions giving rise to Plaintiffs' claims occurred in New York, including within this District.

11. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants operate in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

### Background

12. Plaintiff Alegria Productions, Inc. ("Alegria") is one of the most recognizable and longstanding LGBTQ+ event production companies in the United States. For more than twenty-five years, through its principal Ric Sena, Alegria has produced more than 235 events throughout the United States and internationally, earning a reputation for world-class productions and immersive entertainment experiences.

13. Under Mr. Sena's artistic direction, Alegria has become known for producing large-scale events featuring internationally renowned DJs, elaborate stage designs, custom-built sets and costumes, sophisticated lighting and laser displays, and other theatrical production elements designed to create a unique and immersive experience for attendees.

14. Alegria's events have cultivated a loyal following within the LGBTQ+ community. More than entertainment, Alegria's productions have become annual gatherings that bring together friends, visitors, artists, performers, and members of the LGBTQ+ community from across the United States and around the world.

15. Among Alegria's signature productions is "Alegria Pride," an annual event held during New York City's Pride Weekend. Except for a brief interruption during the COVID-19 pandemic, Alegria Pride has been held in New York City every summer, with few exceptions on Sunday during New York Pride Weekend, and has become a longstanding New York City Pride Weekend tradition.

16. The successful production of Alegria Pride requires months of planning and substantial financial commitments, including securing an appropriate venue, contracting with

performers, artists, production personnel, and vendors, custom designing and fabricating décor, centerpieces, scenic installations, props, and other event production materials, marketing the event, and coordinating the extensive logistical, technical, and operational production necessary for an event of Alegria's scale.

17. The availability of venues capable of accommodating an event of Alegria Pride's size and production requirements during New York City Pride Weekend is extremely limited. Such venues are typically reserved many months in advance, making the loss of an appropriate venue shortly before the event impossible to replace on short notice.

**The Parties' Negotiations and Agreement**

18. In or about March 2026, Plaintiff began discussions with Defendants regarding the possibility of hosting Alegria Pride at 99 Scott in Brooklyn, New York.

19. Plaintiff's initial primary point of contact during the negotiations was Luka Tacon, a representative of Defendants who was responsible for marketing the venue and negotiating event agreements on Defendants' behalf.

20. From the very beginning of these negotiations, Mr. Tacon was fully familiar with the nature, scope, and production requirements of Alegria Pride.

21. The parties specifically discussed the event schedule, anticipated attendance, production requirements, and operational needs throughout the negotiation process.

22. Defendants understood that Alegria Pride was intended to operate continuously from 5:00 p.m. until 5:00 a.m. and that those operating hours were an essential component of the event's planning and execution.

23. Defendants actively described 99 Scott as perfect for Alegria Pride. Among the venue's principal selling points was its expansive outdoor courtyard, which Defendants

represented could be integrated with the indoor venue to create a seamless multi-stage experience during the event.

24. The outdoor courtyard was a central and material component of Plaintiff's decision to contract with Defendants. Plaintiff specifically selected 99 Scott because the combined use of the Main Space and Courtyard would accommodate Alegria Pride's anticipated attendance, production design, and event programming throughout the contracted operating hours.

25. Of the approximately 3,000 attendees that the venue could accommodate, the outdoor courtyard accounted for approximately 70% of that capacity. As a result, the overwhelming majority of the venue's usable event space and patron capacity was located outdoors. Defendants knew that the outdoor courtyard was the centerpiece of the venue and an essential component of Plaintiff's decision to enter into the Agreement.

26. Defendants knew that Plaintiff needed to utilize both the Main Space and Courtyard simultaneously throughout the event and that the event's anticipated attendance depended upon the combined capacity of both areas operating together throughout the night.

27. The final agreement (the "Agreement"), which was signed April 22, 2026, reflected those discussions.

28. The Agreement provided for use of both the Main Space and Courtyard from 5:00 p.m. ("Event Start Time") until 5:00 a.m. ("Event End Time"), and with the "License Term" specifically delineated as from "06/28/26 08:00am - 06/29/26 08:00am".

29. The Agreement also specifically states that there would be a capacity of 3,000 people, and defines the "Event Space" as "99 Scott - Main Space + Courtyard."

30. The Agreement clearly stated that the Venue would "provide the Event Space for the Event from the Event Start Time through the Event End Time" which meant that the

Main Space *and* the Courtyard should have been made available from 5:00 PM until 5:00 AM the following day for the event.

**Plaintiff's Performance of Obligations**

31. After Mr. Tacon departed Defendants' organization, Blake Cummings assumed responsibility for Plaintiff's account. Mr. Tacon assured Plaintiff that Mr. Cummings would continue handling the event and that Plaintiff would be in good hands.

32. Thereafter, Mr. Cummings continued working with Plaintiff in preparation for Alegria Pride, further confirming Defendants' understanding of the event's scope, operational requirements, and reliance upon the combined indoor and outdoor event spaces.

33. From March 2026 when the negotiations began, until June 2026, at no point did Defendants ever indicate, advise or warn that there might be any issues at all with the operations of the event.

34. Following execution of the Agreement, Plaintiff immediately began performing its obligations thereunder and devoted substantial time, effort, and financial resources toward producing Alegria Pride in accordance with the parties' agreement.

35. Consistent with its obligations under the Agreement, Plaintiff contracted with internationally recognized DJs, performers, production personnel, fabricators, costume designers, and numerous other vendors necessary to produce Alegria Pride.

36. Plaintiff also undertook a marketing campaign for Alegria Pride, including marketing the event to thousands of prior Alegria attendees and customers, promoting the event through social media and other advertising channels, developing and implementing a ticketing system for purchasers, placing tickets on sale to the public starting April 6, 2026, and actively selling tickets in anticipation of the event.

37. Although the Agreement required Defendants to provide the venue's lighting systems, Plaintiff nevertheless went above and beyond its contractual obligations by independently sourcing supplemental video, lighting, and production equipment at its own expense. Plaintiff did so to ensure that the presentation throughout Alegria Pride met the standards and quality for which Alegria had become known over the course of more than twenty-five years of producing premier LGBTQ+ events.

38. In reliance upon Defendants' promises and contractual commitments, Plaintiff expended approximately $120,000 in the months leading up to Alegria Pride. Those expenditures included, among other things, payments for performers and talent, staging, production personnel, custom-designed and fabricated décor, centerpieces, props, scenic installations, costumes, graphic design, video production, advertising, marketing, staffing, travel, equipment rentals, and numerous other costs necessarily incurred in producing an event of Alegria Pride's scale. In addition to these substantial out-of-pocket expenditures, Plaintiff's principal, Ricardo Sena ("Mr. Sena"), devoted hundreds of hours of personal time, effort, and expertise to planning, organizing, and producing the event.

**<u>Defendants Reveal the Venue Was Not Permitted to Operate as Contracted</u>**

39. Throughout the months-long planning process, Defendants repeatedly worked with Plaintiff in preparation for Alegria Pride and stayed in regular communications.

40. Defendants continued to coordinate with Plaintiff regarding production, staging, staffing, technical requirements, and other logistical details, reinforcing Plaintiff's understanding that the event would proceed as contracted.

41. On or about June 11, 2026, Mr. Sena met with Defendant’s manager Blake Cummings at 99 Scott for a walkthrough of the venue in preparation for Alegria Pride.

42. During that meeting, Mr. Cummings informed Mr. Sena, for the first time, that there was an issue concerning the use of the outdoor courtyard after 11:00 p.m.

43. Rather than presenting the issue as a fundamental obstacle to the event, Defendants initially attempted to raise it in a casual manner, as though it were simply an unforeseen operational detail that had not previously been mentioned.

44. Mr. Sena was dumbfounded. At first, he believed he must have misunderstood Mr. Cummings. It was inconceivable to Mr. Sena that Defendants were only then disclosing that the venue could not lawfully be operated in the manner expressly contemplated by the parties.

45. Mr. Sena immediately informed Mr. Cummings that the newly disclosed restriction was wholly unacceptable. He explained that Alegria Pride had been specifically designed around the simultaneous use of both the indoor venue and the outdoor courtyard throughout the contracted hours and that eliminating the courtyard after 11:00 p.m. fundamentally changed the event the parties had agreed to produce.

46. Without the courtyard operating throughout the event, the venue could neither accommodate the anticipated attendance nor provide the multi-stage experience that had been planned, marketed, and sold to the public.

47. Mr. Sena also made clear that the timing of Defendants' disclosure left Plaintiff with virtually no opportunity to mitigate its damages.

48. By June 11, 2026, Plaintiff had already spent approximately $120,000 in reliance upon the Agreement. Pride Weekend was only weeks away, and venues capable of accommodating an event of Alegria Pride's size and production requirements had long since been reserved.

49. Mr. Cummings acknowledged the seriousness of the situation and assured Mr. Sena that he understood why the restriction was incompatible with Alegria Pride. Mr.

Cummings further advised that he would immediately raise the issue with Defendants' ownership and management and represented that Defendants would promptly and diligently address the matter in an effort to find a solution

50. Relying upon those assurances, Plaintiff temporarily refrained from immediately cancelling the event and instead cooperated with Defendants in the hope that Defendants would honor their contractual commitments or otherwise resolve the permitting issue.

51. Shortly after Mr. Cummings escalated the matter to Defendants' management, Plaintiff was introduced to Nell Skoda, Defendants' Director of Operations and Sales, who assumed responsibility for addressing the issue on behalf of Defendants.

52. On or about June 16, 2026, Ms. Skoda advised Plaintiff that Defendants had completed a "permitting and operational review process" and had determined that the venue could not lawfully operate in the manner promised under the Agreement.

53. Specifically, Ms. Skoda informed Plaintiff that amplified music in the outdoor courtyard was required to cease at 11:00 p.m., notwithstanding the parties' agreement that Alegria Pride would continue until 5:00 a.m. utilizing both the Main Space and the Courtyard.

54. Ms. Skoda further advised Plaintiff that Defendants had also determined that the venue's maximum occupancy was actually only 1,800 persons for the indoor and outdoor areas combined, rather than the approximately 3,000-person capacity represented to Plaintiff during the parties' negotiations and reflected in the Agreement.

55. These disclosures confirmed that Defendants had contracted to host Alegria Pride despite lacking the operational approvals necessary to provide the venue as promised.

56. Plaintiff immediately advised Ms. Skoda that Defendants' proposed solution—requiring the event to move entirely indoors after 11:00 p.m.—was wholly unworkable.

57. Plaintiff explained that the outdoor courtyard had always been intended to serve as the primary stage and centerpiece of the event, that approximately seventy percent of the venue's represented capacity depended upon the courtyard.

58. Plaintiff further explained that moving the entire audience indoors after 11:00 p.m. would create an overcrowded, unsafe, and fundamentally different event than the one Defendants had agreed to host and Plaintiff had promised to thousands of attendees. Plaintiff emphasized that the event simply could not proceed under those conditions.

**Defendants Refuse to Pursue the Available Permitting Process**

59. Plaintiff urged Defendants to pursue every available avenue to honor the Agreement, including seeking any available permit modification, temporary authorization, curfew extension, or other governmental approval that would allow the courtyard to remain operational for the contracted hours.

60. Plaintiff emphasized that such accommodations were commonly sought for major Pride Weekend events and requested that Defendants exhaust every reasonable option before abandoning their contractual obligations.

61. Despite Plaintiff's repeated requests, Defendants made no effort to obtain any additional permit, variance, waiver, extension, or other governmental authorization that would have enabled them to perform their contractual obligations.

62. Instead, Defendants simply informed Plaintiff that the event would have to conclude outdoors at 11:00 p.m. and suggested that the remainder of the event be moved indoors.

63. The sheer absurdity of Defendants' proposed solution cannot be overstated. As Defendants knew from months of planning and coordination with Plaintiff, Alegria Pride was a late-night music event.

64. Indeed, for events of this nature, the vast majority of attendees do not even begin to arrive until after 11:00 p.m. Defendants' suggestion that Plaintiff simply move the entire event indoors at that hour ignored not only the venue's dramatically reduced capacity, but also the realities of the event they had agreed to host.

65. Rather than accepting Defendants' position, Mr. Sena undertook extraordinary efforts on his own to salvage the event.

66. Although obtaining the necessary governmental approvals was Defendants' responsibility as the venue operator, Mr. Sena nevertheless began independently investigating whether any permitting solution existed that would allow Defendants to honor the Agreement.

67. Mr. Sena contacted industry professionals and individuals familiar with New York City event permitting in an effort to determine whether a temporary permit, special event authorization, or other accommodation could be obtained. He devoted substantial time and effort attempting to solve a problem that existed solely because Defendants had failed to secure the approvals necessary to operate the venue as promised.

68. Mr. Sena identified a potential permitting pathway through an established LGBTQ+ nonprofit organization that was willing to assist Defendants in obtaining the governmental approvals necessary for the event. Mr. Sena immediately communicated this potential solution to Defendants and urged them to pursue it.

69. Based upon more than twenty-five years of experience producing large-scale LGBTQ+ events, including repeatedly organizing Alegria Pride and other major events in New York City, Mr. Sena reasonably believed that a pathway existed to obtain the governmental approvals necessary for the event to proceed as contracted.

70. Through his years of experience producing large-scale events in New York City, Mr. Sena knew that, had Defendants timely acted, the necessary permits, approvals,

variances, or operational accommodations could have been pursued and there was a reasonable likelihood that the event could have proceeded substantially as planned, even if such efforts were undertaken on an expedited or last-minute basis.

71. Mr. Sena also knew that, while he could identify potential solutions and repeatedly urge Defendants to pursue them, he lacked the legal authority to obtain the necessary permits, approvals, or operational accommodations himself. Those approvals could only be sought and obtained by Defendants, as the venue operator and the entity with the requisite authority and control over the Premises.

72. Rather than pursuing the permitting process identified by Mr. Sena, Defendants refused to even try.

73. Defendants did not submit an application for a temporary permit, did not seek a curfew extension, did not request a variance, and did not otherwise pursue any administrative or governmental relief that would have permitted the outdoor courtyard to remain operational as contemplated by the parties' Agreement.

74. Defendants likewise refused to work with the LGBTQ+ Pride organization identified by Mr. Sena or otherwise investigate the permitting pathway that Mr. Sena had identified through his decades of experience producing Pride events in New York City.

75. Defendants' refusal to pursue any meaningful solution was particularly unreasonable given that Plaintiff—not Defendants—had identified the potential permitting pathway, despite the fact that the responsibility for obtaining and maintaining the permits necessary to operate the venue rested with Defendants as the venue operators.

76. At all relevant times, Plaintiff stood ready and willing to cooperate with Defendants in any permitting effort and to provide whatever assistance reasonably requested. Defendants nevertheless declined to undertake the efforts necessary to honor their contractual commitments.

**The Cancellation of the Event**

77. As a direct result of Defendants' refusal to pursue the available permitting process, the permitting issue remained unresolved, leaving Plaintiff with no reasonable alternative but to cancel Alegria Pride.

78. Proceeding with Alegria Pride under the conditions dictated by Defendants was not a viable option.

79. By the time Defendants disclosed that the outdoor courtyard could not be used for amplified music after 11:00 p.m., Plaintiff had already extensively marketed and sold tickets to an event expressly advertised as utilizing both the Main Space and Courtyard throughout the contracted event hours.

80. Conducting a materially different event would have required Plaintiff to deliver an experience fundamentally inconsistent with the event that had been advertised and sold to the public, exposing Plaintiff to potential claims under New York's consumer protection laws, including General Business Law §§ 349 and 350, as well as claims arising from false or misleading promotional materials and representations made to ticket purchasers.

81. Faced with those circumstances, cancellation of the event was Plaintiff's only lawful and commercially reasonable course of action

82. Immediately upon making that decision, Plaintiff issued full refunds to every customer who had purchased a ticket to Alegria Pride, notwithstanding the substantial financial consequences to Plaintiff.

83. Mr. Sena also undertook immediate efforts to mitigate the damage to Alegria's goodwill, reputation, and brand. Recognizing that Alegria had spent decades cultivating the trust and loyalty of its customers, Mr. Sena prepared and publicly released a lengthy, detailed, and deeply personal statement explaining the cancellation and apologizing to the thousands of loyal supporters who had purchased tickets and planned to attend Alegria Pride.

84. For Mr. Sena, the public apology was profoundly humiliating. Throughout his years of producing Alegria events, he had built his reputation on delivering exactly the experience that he promised. For the first time in Alegria's history (outside the extraordinary circumstances presented by the COVID-19 pandemic), Mr. Sena was forced to publicly announce that Alegria Pride could not proceed because the venue he had contracted for could not be provided as promised.

85. Despite Mr. Sena's efforts to be transparent with his customers and to minimize the damage caused by Defendants' conduct, Plaintiff nevertheless suffered substantial harm to its goodwill, reputation, customer relationships, and Alegria brand, together with significant financial losses resulting from the cancellation of the event.

86. Based upon Alegria's past Pride events, including numerous such events in New York City, the approximately 3,000-person capacity represented by Defendants, and Alegria's consistent history of selling out or nearly selling out tickets by the time of the event, Plaintiff reasonably anticipated that Alegria Pride 2026 would generate gross revenues of over $500,000.

87. Those anticipated revenues were not speculative, but were based upon Plaintiff's extensive historical operating experience, prior attendance figures, established customer base, the venue capacity represented by Defendants, and the standard tiered ticket pricing system that Alegria Pride used in determining ticket pricing.

88. The annual Alegria Pride event is not merely one event among many in Plaintiff's portfolio. Rather, it is Plaintiff's flagship annual production and one of its most significant sources of revenue and profit.

89. The revenues and profits generated from Alegria Pride play a critical role in financing Plaintiff's operations throughout the remainder of the year, including the planning,

marketing, and production of subsequent Alegria events in New York, Florida, and other locations throughout the United States and internationally.

90. The failure of Alegria Pride would have consequences extending far beyond the cancellation of a single event and would materially impair Plaintiff's ability to conduct future events and sustain its business operations.

**FIRST CAUSE OF ACTION**

**Fraudulent Misrepresentation (Against All Defendants)**

91. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

92. Prior to the execution of the Agreement, Defendants represented to Plaintiff that 99 Scott was capable of hosting Alegria Pride in accordance with the parties' discussions and the terms ultimately memorialized in the Agreement.

93. Specifically, Defendants represented, among other things, that Plaintiff would have exclusive use of both the Main Space and the Courtyard from 5:00 p.m. until 5:00 a.m.; that the venue was suitable for a large-scale Pride Weekend event utilizing both spaces simultaneously; that the venue could accommodate approximately 3,000 attendees; and that the outdoor courtyard would serve as a principal event space throughout the contracted event hours.

94. At the time those representations were made, Defendants either knew they were false, made them with reckless disregard for their truth or falsity, or deliberately concealed material facts concerning the venue's permitting and operational limitations, including the inability to utilize amplified music in the courtyard after 11:00 p.m.

95. During the parties' negotiations, Defendants specifically represented to Mr. Sena that 99 Scott had previously hosted events that continued until approximately 5:00 a.m.,

thereby reinforcing Plaintiff's understanding and expectation that Alegria Pride could likewise continue until that time.

96. Defendants further concealed material facts that they had a duty to disclose because those facts were peculiarly within Defendants' knowledge and were not reasonably discoverable by Plaintiff through the exercise of ordinary diligence.

97. Plaintiff had no practical means of independently determining the scope of Defendants' permits, operational approvals, or restrictions governing the use of Defendants' venue.

98. Defendants intended that Plaintiff rely upon these representations and omissions in deciding whether to book 99 Scott as the venue for Alegria Pride and in expending substantial sums preparing for the event.

99. Plaintiff reasonably relied upon Defendants' representations and omissions in entering into the Agreement, foregoing other potential venues, contracting with performers and vendors, marketing Alegria Pride, selling tickets, and expending approximately $120,000 in preparation for the event.

100. Plaintiff did not learn the truth until June 2026, after the Agreement had been executed, substantial performance had already occurred, and only two weeks remained before Alegria Pride was scheduled to take place.

101. As a direct and proximate result of Defendants' fraudulent misrepresentations and fraudulent concealment, Plaintiff has sustained damages including, without limitation: (a) approximately $120,000 in expenditures incurred in reliance upon Defendants' representations; (b) the loss of anticipated revenues from Alegria Pride in excess of $600,000; (c) damage to Plaintiff's goodwill, brand, customer relationships, and future business, reasonably estimated to exceed $250,000; and (d) such additional damages as may be proven at trial.

## SECOND CAUSE OF ACTION

### Breach of Contract (Against 99 Scott Studio LLC)

102. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

103. The Agreement constitutes a valid and enforceable contract between Plaintiff and Defendants.

104. Plaintiff fully performed, or was ready, willing, and able to perform, all of its obligations under the Agreement.

105. Among other things, Defendants expressly agreed to provide Plaintiff with exclusive use of the Main Space and Courtyard from 5:00 p.m. until 5:00 a.m. for Alegria Pride, with the Event Space consisting of the "99 Scott – Main Space + Courtyard" and a represented capacity of approximately 3,000 persons.

106. Defendants materially breached the Agreement by, among other things: a. Failing to provide the contracted Event Space throughout the contracted event hours; b. Failing to provide a venue capable of being lawfully operated in the manner expressly contemplated by the Agreement; c. Failing to disclose material operational and permitting restrictions until weeks before the event, after Plaintiff had substantially performed its obligations and incurred substantial expense; d. Failing to provide a venue with the agreed-upon capacity; e. Failing to provide the outdoor courtyard for amplified music throughout the contracted event hours; and f. Otherwise failing to perform their obligations under the Agreement.

107. Defendants' breaches defeated the essential purpose of the Agreement and deprived Plaintiff of the benefit of its bargain.

108. Defendants' conduct constituted gross negligence and/or willful misconduct within the meaning of the Agreement, including but not limited to contracting to provide a

venue for Alegria Pride without first ensuring that the venue possessed the permits and operational approvals necessary to host the event as promised; failing for months to disclose material permitting restrictions uniquely within Defendants' knowledge; waiting until mere days before the event to reveal that the contracted event could not lawfully be conducted as agreed; and thereafter refusing to undertake reasonable efforts to obtain the approvals necessary to perform their contractual obligations despite Plaintiff identifying a viable permitting pathway.

109. Defendants' gross negligence and/or willful misconduct independently precludes Defendants from relying upon the Agreement's limitation of liability provision.

110. As a direct and proximate result of Defendants' material breaches of the Agreement, Plaintiff has sustained damages including, without limitation: (a) approximately $120,000 in expenditures incurred in reliance upon the Agreement; (b) the loss of anticipated revenues from Alegria Pride in excess of $600,000; (c) damage to Plaintiff's goodwill, reputation, customer relationships, and ongoing business, reasonably estimated to exceed $250,000; and (d) such additional compensatory, consequential, and incidental damages as may be established at trial.

111. This cause of action seeks damages against 99 Scott Studio LLC only.

## THIRD CAUSE OF ACTION

### Breach of Contract and Recission (Against 99 Scott Studio LLC)

112. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

113. Plaintiff fully performed, or was ready, willing, and able to perform, all of its obligations under the Agreement.

114. Among other things, Defendants expressly agreed to provide Plaintiff with exclusive use of the Main Space and Courtyard from 5:00 p.m. until 5:00 a.m. for Alegria Pride, with the Event Space consisting of the "99 Scott – Main Space + Courtyard" and a represented capacity of approximately 3,000 persons.

115. Defendants materially breached the Agreement by, among other things: a. Failing to provide the contracted Event Space throughout the contracted event hours; b. Failing to provide a venue capable of being lawfully operated in the manner expressly contemplated by the Agreement; c. Failing to disclose material operational and permitting restrictions until mere days before the event; d. Reducing the usable capacity of the venue from approximately 3,000 persons to approximately 1,800 persons; e. Prohibiting amplified music in the courtyard after 11:00 p.m., notwithstanding the parties' agreement that the event would continue until 5:00 a.m. utilizing both the Main Space and Courtyard; and f. Otherwise failing to perform their obligations under the Agreement.

116. Defendants' breaches defeated the essential purpose of the Agreement and deprived Plaintiff of the benefit of its bargain. The venue Defendants ultimately offered was materially different from the venue Defendants had agreed to provide.

117. Defendants' breaches constituted a complete failure of consideration because Defendants were unable to provide the principal subject matter of the Agreement—a venue capable of hosting Alegria Pride in the manner, capacity, and operating hours expressly agreed upon by the parties.

118. As a direct and proximate result of Defendants' material breaches, Plaintiff suffered substantial damages, including but not limited to expenditures incurred in reliance upon the Agreement, lost business opportunities, injury to goodwill and reputation, and other damages to be determined at trial.

119. Defendants' breaches were so substantial and fundamental that they defeated the object of the parties' Agreement and (in the alternative to the second cause of action) cannot adequately be remedied merely through enforcement of isolated contractual provisions.

120. Plaintiff seeks rescission in the alternative to its claim for damages. Should the Court determine that rescission is the appropriate remedy, Plaintiff requests such additional equitable monetary relief as is necessary to restore Plaintiff, as nearly as possible, to the position it occupied before entering into the Agreement.

121. This cause of action seeks damages against 99 Scott Studio LLC only.

## FOURTH CAUSE OF ACTION

### Gross Negligence (Against All Defendants)

122. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if repeated and incorporated herein.

123. Defendants owed Plaintiff a duty to exercise reasonable care in the permitting, and licensing of 99 Scott so as not to expose Plaintiff to foreseeable harm arising from Defendants' failure to obtain and maintain the governmental approvals necessary to host Alegria Pride as represented.

124. Defendants breached that duty by engaging in conduct that constituted gross negligence, including, without limitation: a. Marketing and contracting to provide a venue for Alegria Pride without first ensuring that the venue possessed the permits and operational approvals necessary to host the event as promised; b. Failing to determine, prior to entering into the Agreement, whether the outdoor courtyard could lawfully be utilized for amplified music throughout the contracted event hours; c. Concealing material permitting and operational restrictions from Plaintiff throughout months of negotiations and event planning;

d. Waiting until mere days before the event to disclose that the contracted event could not lawfully be conducted as agreed; e. Continuing to permit Plaintiff to incur substantial expense, contract with vendors and performers, market the event, and sell tickets while withholding information uniquely within Defendants' knowledge; f. Failing and refusing to pursue reasonable permitting solutions after those restrictions were discovered, despite Plaintiff identifying a potential pathway by which the necessary governmental approvals could be obtained; and g. Otherwise acting with reckless disregard for the foreseeable and catastrophic consequences their conduct would have upon Plaintiff, its business, and the thousands of customers who had purchased tickets to Alegria Pride.

125. Defendants' conduct constituted substantially more than ordinary negligence. It demonstrated a reckless disregard for the rights and interests of Plaintiff and an utter indifference to the consequences that Defendants knew, or should have known, would result from their conduct.

126. As a direct and proximate result of Defendants' gross negligence and/or willful misconduct, Plaintiff has sustained substantial damages, including but not limited to: (a) approximately $120,000 in expenditures incurred in reliance upon Defendants' representations and the Agreement; (b) the loss of anticipated revenues from Alegria Pride in excess of $600,000; (c) damage to Plaintiff's goodwill, reputation, customer relationships, and ongoing business, reasonably estimated to exceed $250,000; and (d) such additional compensatory, consequential, incidental, and other damages as may be proven at trial.

127. Defendants' conduct was willful, wanton, and demonstrated a reckless and conscious disregard not only for the rights of Plaintiff but also those of the thousands of members of the public who had purchased tickets and reasonably relied upon Defendants' representations that Alegria Pride would proceed as advertised.

128. Defendants knew, or should have known, that their conduct would not merely cause financial harm to Plaintiff, but would also deprive thousands of loyal attendees of an annual event that had, for more than two decades, served as a cornerstone of New York City's Pride celebration and an important opportunity for members of the LGBTQ+ community to gather, reconnect, and celebrate together.

129. Defendants' conduct exhibited such a high degree of moral culpability and reckless indifference to the rights of others as to warrant the imposition of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

130. Defendants' gross negligence independently precludes Defendants from invoking the limitation-of-liability provision contained in the Agreement, which expressly excludes losses caused by Defendants' gross negligence or willful misconduct.

## FIFTH CAUSE OF ACTION

### Gross Negligent Misrepresentation (Against All Defendants)

131. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if repeated and incorporated herein.

132. Defendants owed Plaintiff a duty to provide accurate information concerning 99 Scott's capacity, permitting status, operational restrictions, and ability to host Alegria Pride as contemplated by the parties.

133. A special relationship approaching privity existed between Plaintiff and Defendants. Defendants were not strangers casually supplying information to the public; they were professional venue operators directly negotiating with Plaintiff for the specific purpose of inducing Plaintiff to book 99 Scott for Alegria Pride.

134. Defendants possessed superior and exclusive knowledge concerning the venue's permitting status, occupancy limitations, sound restrictions, operational approvals, and ability to operate the Main Space and Courtyard throughout the contracted event hours.

135. Plaintiff could not reasonably verify those facts on its own. Plaintiff was required to rely upon Defendants, as the venue owners, operators, managers, and permit-holders, to provide accurate information concerning whether 99 Scott could lawfully and safely host the event Defendants were selling.

136. Defendants knew that Plaintiff needed this information for a serious commercial purpose: deciding whether to book 99 Scott for Alegria Pride, whether to forego other available venues, and whether to incur substantial financial obligations for performers, vendors, production, marketing, staffing, ticketing, and other event-related expenses.

137. Defendants further knew that Plaintiff intended to rely, and would in fact rely, upon Defendants' representations concerning the venue's suitability, capacity, operating hours, and ability to provide both the Main Space and Courtyard for the event.

138. Defendants negligently supplied false and misleading information by representing that 99 Scott could host Alegria Pride as contemplated, including with simultaneous use of the Main Space and Courtyard from 5:00 p.m. until 5:00 a.m. and with an approximate capacity of 3,000 attendees.

139. Defendants also negligently omitted material information by failing to disclose that the courtyard could not be used for amplified outdoor music after 11:00 p.m. and that the venue's operational capacity was materially lower than represented.

140. Defendants knew, or in the exercise of reasonable care should have known, that their representations and omissions were false, incomplete, or misleading.

141. Defendants' conduct constituted gross negligence. Defendants did not merely make an inadvertent mistake or exercise poor business judgment. Rather, Defendants

recklessly marketed and contracted to provide a venue for Alegria Pride without first ensuring that the venue possessed the permits and operational approvals necessary to host the event as promised, failed for months to disclose material operational restrictions uniquely within their knowledge while Plaintiff expended substantial sums in reliance upon Defendants' representations, waited until only weeks before the event to reveal that the venue could not lawfully operate as contracted. Such conduct demonstrated a reckless disregard for Plaintiff's rights and an utter indifference to the foreseeable and devastating consequences of Defendants' actions.

142. Plaintiff reasonably relied upon Defendants' representations and omissions by entering into the Agreement, foregoing alternative venues, contracting with performers and vendors, marketing Alegria Pride, selling tickets, and expending approximately $120,000 in preparation for the event.

143. As a direct and proximate result of Defendants' gross negligent misrepresentations and omissions, Plaintiff suffered pecuniary losses in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**

**Contractual Attorneys' Fees (Against 99 Scott Studio LLC Only)**

144. Plaintiff repeats and realleges each and every preceding allegation as though fully set forth herein.

145. Plaintiff and Defendant 99 Scott Studio LLC are parties to the Agreement.

146. Paragraph 31 of the Agreement provides that the prevailing party in any action arising out of or relating to the Agreement is entitled to recover its reasonable attorneys' fees, costs, and expenses incurred in enforcing its rights thereunder.

147. This action arises directly out of Defendant 99 Scott Studio LLC's breaches of, and conduct relating to, the Agreement.

148. As a direct and proximate result of Defendant 99 Scott Studio LLC's conduct, Plaintiff has been required to retain counsel and has incurred, and will continue to incur, substantial attorneys' fees, costs, expenses, and disbursements in prosecuting this action.

149. Plaintiff is entitled to recover all reasonable attorneys' fees, litigation expenses, costs, and disbursements incurred in this action pursuant to Paragraph 31 of the Agreement, together with such additional relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff Alegria Productions, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants 99 Scott Studio LLC and Happier People Management LLC, jointly and severally, and award the following relief:

A. Awarding Plaintiff compensatory damages in an amount not less than Nine Hundred Seventy Thousand Dollars ($970,000.00), together with such additional compensatory, consequential, incidental, reliance, restitutionary, and other damages as may be proven at trial;

B. Awarding Plaintiff punitive damages in an amount to be determined at trial sufficient to punish Defendants for their gross negligence, willful misconduct, fraudulent misrepresentations, and fraudulent concealment, and to deter similar conduct in the future;

C. On the Third Cause of Action, in the alternative, rescinding the Agreement, declaring it null, void, and of no further force or effect, and awarding such restitutionary and equitable relief as is necessary to restore Plaintiff, insofar as practicable, to the position it occupied prior to entering into the Agreement;

D. Declaring that Defendants' conduct constituted gross negligence and/or willful misconduct within the meaning of the Agreement, such that any contractual limitation of liability contained therein is unenforceable and inapplicable;

E. Awarding Plaintiff pre-judgment interest and post-judgment interest as permitted by law;

F. Awarding Plaintiff the costs and disbursements of this action;

G. Awarding Plaintiff its reasonable attorneys' fees to the extent recoverable under the Agreement; and

H. Awarding such other and further legal and equitable relief as the Court deems just and proper.

Dated: New York, New York
August 25, 2026

Respectfully submitted,
DGW Kramer LLP

By: /s/ Jacob Chen
Jacob Chen, Esq.
45 Rockefeller Plaza, 20th Floor
New York, New York, 10111
E-mail: jchen@dgwllp.com

Attorneys for Plaintiff